# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**DENNICE PRIMO,**

                       **Plaintiff,**        **CIVIL ACTION NO. _____**

**Vs.**

**AETNA MEDICAID ADMINISTRATORS, LLC, a/k/a**
**CVS HEALTH,**

**Defendant.**

## COMPLAINT

Plaintiff Dennice Primo ("Primo") files this Complaint, against Aetna Medicaid Administrators LLC, a/k/a CVS Health ("Aetna") showing the Court as follows:

1.

This is a civil rights complaint for discrimination against and retaliation against Primo in violation of Title VII of the Civil Rights Act of 1964 as amended by the Civil Rights Act of 1991, 42 USC 2000e et seq. ("Title VII"), and the Americans With Disabilities Act, 42 USC 12101.

2.

Aetna is a limited liability company organized under the laws of Connecticut with its principal office located at 4750 44th Place, Suite 150, Phoenix AZ 85040.

Aetna is authorized to do business in Georgia, and its Registered Agent in Georgia is CT Corporation System, 289 S Culver Street, Lawrenceville, Gwinnett County, GA 30046-4805.

4.

This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. 1331 and 28 U.S.C. 1343, and 28 U.S.C. 1332 as to the state law claims, the amount in controversy being over $75,000.

5.

Venue is proper in this Court under 28 U.S.C. 1391 (b) and (c).

6.

Within 180 days of the beginning of the discriminatory acts complained of herein, on July 7, 2023, the Plaintiff filed with the Equal Employment Opportunity Commission ("EEOC") a timely Charge of Discrimination alleging unlawful age discrimination in violation of the Age Discrimination in Employment Act of 1967, as amended.

7.

Primo knew her employer as "Aetna d/b/a CVS Health" and therefore utilized "Aetna d/b/a CVS Health" as the name of her employer in her charge.

8.

Primo's EEOC Charge was assigned number 410-2023-09244.

9.

In the February 2, 2024, letter from Morgan Brown & Joy submitted to the EEOC by attorney LaDonna J. Hatton in response to the Charge, Hatton and Morgan Brown & Joy informed the EEOC and Primo that Aetna Medicaid Administrators, LLC was the proper Respondent to the Charge.

10.

Aetna was Primo's employer as defined in 42 USC 2000e (b), and its counsel admitted it was Primo's employer in Aetna's position statement.

11.

The EEOC, on April 4, 2024, issued to Primo a Determination and Notice of Rights in response to her EEOC Charge, making no determination about whether further investigation would establish violations of the statutes at issue. The Notice informed Primo of her right to sue Aetna. A copy of the Notice, or Right to Sue Letter, is attached hereto as Exhibit A.

12.

Primo properly exhausted her administrative remedies regarding her federal claims, and Primo has initiated the present lawsuit within 90 days of her receiving the EEOC Notice of Right to Sue, which was mailed to her home address.

13.

Aetna committed illegal discrimination against Primo by using as a but for cause for its adverse employment actions against Primo her race (African American), and because of Primo's need to care for her father, an immediate family member.

14.

Though Primo has been discriminated against by Aetna in late 2022, the discrimination that intensified after February 1, 2023, when she returned from carrying for her father, was the subject of the July 7, 2023, charge.

15.

Primo in her Charge referred to her position when she left when Aetna as being Prior Authorization Nurse.

16.

Aetna in its response to the Charge stated that Primo's position was "Utilization Management ("UM") Nurse Associate" and that Primo's primary role

was to make authorization recommendations regarding health care services for members.

17.

February 1, 2023, was the date that Plaintiff returned from a leave that Primo took to take care of her father, who resided out of the State of Georgia and was very ill. The leave began on December 26, 2022.

18.

Defendant wrongfully refused to provide Primo FMLA leave. Even though it was her father's health that was at issue, Aetna's Leave of Absence Department asked Primo for documentation from Primo's health provider. The erroneous request caused a timing issue such that the frustrated Primo withdrew the original request for FMLA leave.

19.

On January 3, 2023, Primo requested to be allowed to use Paid Time Off she had accrued for the duration of her requested leave, which was far shorter than the 12 weeks of FMLA leave that Primo was entitled to.

20.

Primo was eligible for the FMLA leave as she met the qualifying condition of needing to care for her father, who had a serious health condition.

21.

Primo was eligible for the FMLA leave as she met the qualifying condition that she worked for a covered employer, as Aetna had far more than the 50 employees the FMLA requires for a private sector employer to be covered.

22.

Primo was eligible for the FMLA leave as she met the qualifying condition of working at a location where the employer has 50 or more employees within 75 miles.

23.

Primo was eligible for the FMLA leave as she met the qualifying condition of having worked for Aetna for 12 months (her start date was in 2014).

24.

Primo was eligible for the FMLA leave as she met the qualifying condition of having worked 1,250 hours for Aetna during the 12 months prior to the start of the requested leave.

25.

Primo was certainly entitled to take up to 12 weeks of unpaid, job-protected leave under the FMLA.

26.

Aetna on page 21 of its Handbook, which it titled "CVS Health Colleague Handbook," that an employee (referred to as "colleague") was entitled to FMLA leave in exactly the circumstances Primo presented to Aetna.

27.

Aetna expressly told Primo in the Handbook that a "colleague may use any accrued paid time during an otherwise unpaid FMLA leave.

28.

Department Interim Supervisor Collen Tomahausen, a Caucasian, immediately denied Primo's January 3, 2023, request to use her paid time off, and therefore Primo reached out to Aetna Human Resources, which immediately told her to talk to the Clinical Director, Leslye Jones (Caucasian).

29.

Primo had notified Tomahausen, another Department Interim Supervisor, Savannah Blevins (Caucasian), and Jones in December 2022 that certain protocols that Tomahausen and Blevins had instructed the department to use in its work were

not compliant with Aetna standards previously promulgated, or standards of
practice required by Medicare and Medicaid.

30.

All three of Primo's superiors took umbrage at Primo's questioning or
criticizing the protocols instead of investigating Primo's concerns.

31.

A motivating factor for all three of the Supervisors' rejection of Primo's
concerns was racial animus.

32.

Therefore, when Primo talked to Jones about the requested leave as
instructed by Aetna HR, Jones was combative, and announced to Primo that Primo
had a bad relationship with management. This was news to Primo, who had
worked under the new supervisors for only one month (they had arrived on
November 30, 2022).

33.

Jones told Primo in this early January 2023 conversation that Primo was
completely responsible for Primo's bad relationship with management, and that
Primo had to take full responsibility for that bad relationship.

34.

Jones, in the context of denying Primo the ability to use her PTO, told Primo that Primo that she was now seen as an employee who underperformed (after being supervised by the new supervisors for hardly a month) and announced to Primo's surprise that Primo had violated department standards of practice.

35.

Primo responded to Jones that she was doing the work in question in accordance with the training she had received from Aetna employee Sherry McGuire, who had been held out by Aetna as a subject matter expert.

36.

Jones, in response to Primo's telling Jones that she was following McGuire's training, told Primo that McGuire had been training new staff incorrectly, and had been relieved of her training function.

37.

Joners also told Primo that some, but not all, of the workers that McGuire had improperly trained would be given the opportunity to be retrained, implying that Primo would not be among those retrained.

38.

Tomahausen and Blevins, when installed in their positions, had imposed an arbitrary system of discipline where employees in roles such as the one Primo filled could receive black marks on their record which would accelerate their being put on a Corrective Action Plan ("CAP"). Only the employees protected by race who worked in the department found themselves under CAPs imposed by Tomahausen and Blevins.

39.

Primo expressed concern to Jones that she would be placed on a CAP  in the late December, 2022, meeting, and again in January, 2024 and February, 2024.

40.

As a result of the discussions with Jones, Primo did get Aetna and Jones to understand that she wanted to take time off to care for her father, and Jones told her not to request general leave, but instead intermittent leave, an impractical solution because Primo's father lived out of state.

41.

Primo's general leave was denied and instead Aetna instructed her to tend to her father one or two times a month during the period January 1, 2023, through June 29, 2023.

42.

Primo's general leave was denied because of her race and the general inclination of Aetna management in Primo's department to reduce the number of African American employees in the department.

43.

Aetna forced Primo to take unpaid leave to tend to her father when she was entitled to take paid leave (based on her accrued leave), in violation of the FMLA.

44.

Though Primo was entitled to take up to twelve weeks of unpaid FMLA leave, Aetna denied that FMLA leave as well.

45.

A motivating factor for Aetna's denial of Primo's FMLA leave was her African American race.

46.

Primo returned to work on February 1, 2023, and immediately, on February 2, 2023, faced being put on a CAP, which resulted from claimed mistakes she had made in December 2022.

47.

A motivating factor in Primo's being placed immediately on a CAP upon her return to work was her African American race.

48.

Primo also, upon her return in February 2023, received a 2022 Year End Performance Review, which evaluated her on five goals.

49.

The 2022 Year End Performance Review Primo received in February 2022 stated that she had "Not Started" on any of the goals. Obviously, then, she could not be evaluated on the goals, and Primo wasn't evaluated on them.

50.

Despite this obvious defect in the review, Aetna did rate Primo as to the goals for the entire year of 2022, giving her a 2 out of 5.

51.

The 2022 evaluation of 2 out of 5 was given to Primo by Tomahausen and Blevins with the knowledge of Jones although neither Blevins nor Tomahausen were her managers in 2022, except for the month of December, 2022.

52.

Primo's Performance Review was also Facially defective in that Primo was to be evaluated for "Heart at Work Behaviors." Aetna provided no evaluation, saying "Not provided by previous AM."

53.

The evaluation of 2 out of 5 was based on the fact(?) that Primo had missed three turnaround times ("TATS") during the year, or perhaps after she came "off orientation" in August, 2022, despite the document not saying anything about the length of time involved in the 3 TATS. Also, the Review penalized Primo for taking "unplanned PTO" (in violation of the FMLA).

54.

Despite the Review noting that Primo had not started on any of the goals, it nonetheless gave her a 2 as an "Overall Goal Rating."

55.

Before she had left for leave in December 2022, Primo had been informed by her previous manager Bobbi Caton that Primo would receive an evaluation of "3," "Meets All Expectations," for the year 2022.

56.

Blevins, Tomahausen and Jones collaborated to replace the evaluation from the supervisor who had more familiarity with Primo, who had given Primo an evaluation of "3," and reduced the evaluation to "2" in the slipshod Review document they gave Primo on her return, a copy of which is attached as Exhibit B.

57.

A motivating factor in Aetna's downgrading of Primo's review was Primo's African American race.

58.

Primo arranged a meeting with Tomahausen and Blevins to question the diminution of her rating to a "2." Tomhausen told Primo with Blevins present that Primo was a solidly a 2/5 employee, though she had had hardly a month to supervise Primo.

59.

In response, Primo reminded Tomahausen in the presence of Blevins that she only recently became her manager in December 2023. Tomahausen stated that in that short time I have determined that you are a solid 2/5 employee.

60.

A motivating factor for Aetna's conclusion in this regard was Primo's African American race.

61.

Also motivated by Primo's African American race, Tomahausen was very dismissive of Primo's concerns strongly advised Primo to stop bringing the reduced rating up, because nothing was going to change.

62.

From February 1, 2023 until March 13, 2023, Blevins, Tomahausen and Jones, again with a motivating factor being Primo's race,  suddenly noticed, improperly, nearly daily errors they claimed Primo made, when the year before (2022)  she had only had three TATS, and sent Primo nasty, abusive emails concerning them, in addition to threatening Primo with termination verbally and using other abusive language in interactions with Primo.

63.

Aetna without proper basis and motivated by Primo's race subjected Primo to another Corrective Action Plan ("CAP") on March 13, 2023.

64.

Placing Primo on another CAP triggered Primo's being subjected to an At Risk for Performance Feedback Counseling ("PFC") discussion on March 14, 2023, to be followed with weekly meetings to start March 21, 2023.

65.

The PFC documentation (obtained from Aetna's EEOC position statement but curiously unsigned by either Primo or a manager)  is attached as Exhibit C, and stated Primo's performance would be monitored for 30 days. The PFC

documentation directly threatened termination if the Plan's "Expected Performance" was not met (which was largely a subjective decision).

66.

Given the hostile language used by Blevins, Tomahausen and Jones daily toward her in word and in email, and in the weekly meetings, and given the fact, which she documented in her own review of her work, that she had actually met the metrics Aetna imposed, Primo was gripped by an overpowering fear that she was going to be fired, and that the firing would prevent her from getting another job.

67.

A motivating factor for the hostile language, emails and actions of Blevins, Tomahausen and Jones between February 1, 2023, and March 23, 2023, was Primo's African American race.

68.

Minority employees in Primo's department were the employees subject to Performance Plans and CAPS, as opposed to the Caucasian employees.

67.

And, the Performance Plan Aetna put Primo under left little room for human error and expressly threatened termination. One hundred percent accuracy, largely unobtainable, was demanded on some items in the plan

68.

Blevins, Tomahausen and Jones made Primo's working conditions so difficult, unpleasant, and threatening that a reasonable person would have felt compelled to resign.

69.

Primo was subjected to more than actionable harassment. She had her ranking on her evaluation lowered without basis by her supervisors, in an apparent effort to set her up for firing, after they wrongfully denied her FMLA leave, put her on two CAPS for missing 1 TAT deadline, and then put her on the PFC with the fait accompli being that she would be fired after its 30-day expiration.

70.

Blevins, Tomahausen and Jones were brutally hostile to Primo, motivated in part by her race, and intended to fire her from a job she had kept for eight years based on one month's performance (no, based on their animus toward Primo).

71.

Therefore, Primo resigned effective March 31, 2023, in an email dated
March 23, 2023, titled "Resigning from harassment, bullying and bias in dept led
by toxic management," and her resignation is properly characterized under the law
as a constructive discharge.

## COUNT ONE: RACIAL DISCRIMINATION UNDER TITLE VII

72.

Aetna discriminated against Primo based on race with respect to the terms and
conditions of her employment by rejecting Primo's concerns concerning violations
of Aetna protocols in December 2022 without investigating them, then denying her
leave to which she was entitled in January 2023, then immediately upon her return
on February 1, 2023 presenting her with a performance rating intentionally reduced
to a "2" from a "3" without basis, then putting her on CAP and PFC plans without
basis, placing her under such a threat of termination that she was forced to resign, as
any reasonable person would have, to avoid the black mark of being fired after
having worked for Aetna for 8 years.

73.

A motivating factor of each of the actions of Aetna described above was
Primo's African American race.

74.

Aetna discriminated against Primo based on her race in that white comparators did not have their rating on their Performance appraisals lowered, and white comparators were not put on CAP and/or PFC plans despite having performance comparable to Primo.

75.

Aetna is liable to Primo for its violations of Primo's right to be free from race discrimination under Title VII because her race was one but-for cause of its adverse employment actions against Primo described above.   Babb v. Secretary, Dept. of Veterans Affairs, 992 F. 3d 1193 (11th Cir. 2021).

76.

Aetna made several disadvantageous changes as described above to the terms and conditions of Primo's employment as described above once Blevins, Tomahausen and Jones began supervising her, and treated Primo worse than Caucasian employees, because of her race, and the very fact she was treated worse constitutes prohibited racial discrimination. Muldrow v St. Louis, United States Supreme Court, No. 22-193, decided April 17, 2024.

77.

Primo is entitled to legal and equitable relief from Aetna

such as will effectuate the purposes of Title VII.

78.

District courts enjoy "the historic power of equity" to award lost wages to workmen unlawfully discriminated against such as Hildegard.

79.

Primo is entitled to a back pay award covering the period from March 31, 2023, in an amount to be proven at trial, including but not limited to pay and benefits lost because of Aetna's discrimination against her.

80.

Primo is also entitled to equitable relief against Aetna under Title VII for discrimination committed by Aetna against her, in the form of an award of lost front pay in lieu of reinstatement.

81

Primo is also entitled to an award of compensatory and punitive damages against Aetna in an amount to be proven at trial and awarded in the enlightened conscience of the jury for the intentional discrimination Aetna committed against her.

82.

Primo is also entitled to an award of reasonable attorneys' fees and costs under 29 U.S.C. 216(b):

The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action.

## COUNT TWO: RETALIATION IN VIOLATION OF TITLE VII

83.

Primo engaged in protected activity when she openly opposed Defendants' discrimination against her based on her race in conversations with Blevins, Tomahausen and Jones concerning their denial of the leave to which she was entitled, and concerning their dropping her performance rating without basis, and their putting her on CAP plans a PFC plan specifically intended for use to terminate her.

84.

EEOC Enforcement Guidance on Retaliation and Related Issues issued August 25, 2016, identifies two types of protected activity, "participation," and "opposition."

85.

Primo's pointing out that her work was in compliance with the training she had received from McGuire was met with a racially motivated denial of the

efficacy of McGuire's training and Primo's efforts to defend herself in meetings and the imposition of retaliatory discipline and performance plans.

86.

Primo's reporting suspected racial discrimination against her to Aetna's human resources department and management other than Primo's direct management brought only further hostile feedback from Blevins, Tomahausen and Jones including threats of termination, which became so intense that Primo was constructively terminated.

87.

Primo's complaints to HR and to management other than Primo's direct management created the need for an investigation of Race Discrimination by Aetna and constituted participation protected by Title VII.

88.

Aetna retaliated against Primo for making her complaints, refused to consider the complaints seriously, much less investigate them, and in response to them put Primo on duplicate CAPS and a PFC specifically intended to justify, illegally, her termination, by supervisors who had only worked with her for a total of two and a half months of her total 8-year tenure with Aetna.

89.

The Eleventh Circuit has recognized that the protection of an employee in his participation and/or assistance in an investigation, proceeding or hearing of a claim of employment discrimination is extremely broad, in accordance with the statutory language which the Court has stated is  so broad that it even protects persons accused of the discriminatory behavior, when they are participants in an investigation, proceeding or hearing.

The anti-retaliation provision is straightforward and expansively written. Congress chose the language "testified" and "participated in any manner" to express its intent about the activity to be protected against retaliation. The word "testified" is not preceded or followed by any restrictive language that limits its reach. As to "participated in any manner," the adjective "any" is not ambiguous; it has a well-established meaning. Earlier this year, the Supreme Court explained, "Read naturally, the word `any' has an expansive meaning, that is, `one or some indiscriminately of whatever kind.'" United States v. Gonzales, 520 U.S. 1, 5, 117 S.Ct. 1032, 1035, 137 L.Ed.2d 132 (1997) (citation omitted). Here, as in Gonzales, "Congress did not add any language limiting the breadth of that word," so "any" means all. See id.

Merritt v. Dillard Paper Co., 120 F.3d 1181, 1186 (11th Cir. 1997).

90.

All of Primo's participation in expressing her concerns of Title VII violations by Defendants, and her ability to voice them, were protected by Title VII's anti-retaliation provisions.

91.

Aetna took materially adverse action against Primo in retaliation for her participation in opposition to racial discrimination and therefore as a matter of law engaged in prohibited retaliation against Primo. See Patterson v. Georgia Pacific, LLC, 11th Cir. No. 20-12733 (11th Cir.2022); Gogel v. Kia Motors Mfg. of Ga. Inc., 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc).

92.

The focus in considering whether there has been retaliation in response to "opposition" to discriminatory practices is on the actions or conduct the employee engaged in which allegedly caused the retaliation against the employee.

93.

"Opposed" as used in the opposition clause "carries its ordinary meaning," which includes "to resist or antagonize; to contend against; to confront; resist; withstand." Crawford v. Metro. Gov't of Nashville & Davidson County, 555 U.S. 271, 276 (2009) (cleaned up).

Patterson, slip opinion p.18.

94.

Aetna took materially adverse actions against Primo described above   in retaliation for Primo's opposition to perceived race discrimination, and   a motivating factor and but-for cause of Aetna's' adverse employment actions against Primo   was her opposition to apparent racial discrimination.

95.

Aetna's actions against Primo would dissuade a reasonable worker from making or supporting a charge of discrimination.

96.

Accordingly, Primo is entitled to recover damages from Aetna for retaliation under Title VII.

97.

Primo is entitled to recover compensatory damages from Aetna for Primo's pain and suffering, emotional distress, embarrassment and other damages in an amount to be proven at trial, on this separate retaliation claim, plus attorney's fees and costs.

98.

Title VII retaliation is an intentional tort. Accordingly,Primo is also entitled to recover punitive damages from Aetna  based on Aetna's  specific intent to harm her by retaliating against her,  and because of Aetna's'  willful and wanton actions

in retaliating against Primo, evidencing   an entire want of care evidencing constituting conscious indifference to the consequences of its actions.

## COUNT THREE: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

99.

Working in the extremely hostile environment that Primo worked in caused her crippling emotional distress, manifested physically by increased and uncontrolled heart palpitations, migraine headaches, and insomnia, and manifested mentally by extreme fear and depression, fear and distress so bad she was forced to resign from Aetna.

100.

The conduct of Blevins, Tomahausen and Jones in wrongfully and spitefully reducing her rank on her Performance evaluation without basis or even any extended experience with Primo, and their barrage of CAPs and PFCs on this eight year employee who had met all of Aetna's employment requirements before,  was sufficiently outrageous so as to deliver to Plaintiff a viable claim for intentional infliction of emotional distress under Mayorga v. Benton, 364 Ga. App. 665 (2022).

101.

Aetna is liable for the actions of Blevins, Tomahausen and Jones under the doctrine of Respondeat Superior.

102.

Plaintiff is entitled to a judgment against Aetna for intentional infliction of emotional distress in an amount to be determined in the enlightened conscience of the jury, but not less than $500,000.

103.

In regard to this claim, Aetna has undoubtedly acted in bad faith toward Plaintiff and have caused Plaintiff unnecessary trouble and expense, in additional to its causing Plaintiff to suffer crippling emotional distress.

104.

Accordingly, Plaintiff is entitled to a judgment against Aetna for her expenses of litigation, including reasonable attorneys' fees, under OCGA 13-6-11.

105.

Aetna, as abundantly shown above, acted with specific intent to harm Plaintiff, and are therefore liable to Plaintiff for punitive damages under OCGA

51-12-5.1 in an amount without cap, solely to be determined in the enlightened conscience of the jury, but not less than $1,500,000.

106.

Alternatively, the actions of Aetna were at least willful, wanton, malicious, and showed an entire want of care which would raise a presumption of Aetna's conscious indifference to the harm Aetna was causing to Plaintiff.

107.

Accordingly, Aetna is liable to Primo for punitive damages at the cap level of $250,000, or   in an amount to be determined in the enlightened conscience of the jury.

## COUNT FOUR: VIOLATIONS OF FMLA

108.

29 USC 2617 allows employees such as Primo to sue employers such as Aetna for their violations of 29 USC 2615, which prohibits the following:

**a) Interference with rights**
**(1) Exercise of rights**
It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.
**(2) Discrimination**
It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

**(b) Interference with proceedings or inquiries**

It shall be unlawful for any person to discharge or in any other manner discriminate against any individual because such individual—

(1) has filed any charge, or has instituted or caused to be instituted any proceeding, under or related to this subchapter;

(2) has given, or is about to give, any information in connection with any inquiry or proceeding relating to any right provided under this subchapter; or

(3) has testified, or is about to testify, in any inquiry or proceeding relating to any right provided under this subchapter.

109.

Aetna had a legal duty not to interfere with Primo's exercise of her rights under FMLA, but Aetna violated that duty by so interfering as described above.

110.

Aetna had a duty not to discriminate against Primo for opposing its denial of her exercise of her FMLA rights, but Aetna did discriminate against Primo when Primo opposed the denial, upon her return to work on February 1, 2023, and thereafter.

111.

Aetna is therefore liable to Primo under 29 USC 2617(a)(1) as follows:

**(a) Civil action by employees**

**(1) Liability**

Any employer who violates section 2615 of this title shall be liable to any eligible employee affected—

(A) for damages equal to—

(i) the amount of—

(I) any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation; or

(II) in a case in which wages, salary, employment benefits, or other compensation have not been denied or lost to the employee, any actual monetary losses sustained by the employee as a direct result of the violation, such as the cost of providing care,

up to a sum equal to 12 weeks (or 26 weeks, in a case involving leave under section 2612(a)(3) of this title) of wages or salary for the employee;

(ii) the interest on the amount described in clause (i) calculated at the prevailing rate; and

(iii) an additional amount as liquidated damages equal to the sum of the amount described in clause (i) and the interest described in clause (ii), except that if an employer who has violated section 2615 of this title proves to the satisfaction of the court that the act or omission which violated section 2615 of this title was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of section 2615 of this title, such court may, in the discretion of the court, reduce the amount of the liability to the amount and interest determined under clauses (i) and (ii), respectively; and

(B) for such equitable relief as may be appropriate, including employment, reinstatement, and promotion.

## 112.

Primo is entitled to recover from Aetna lost wages, salary, employment benefits and other compensation denied or lost to Primo because of Aetna's denial of her FMLA leave, plus interest, plus an equal amount as liquidated damages, plus reinstatement or front pay in lieu of reinstatement.

WHEREFORE, Primo prays that the court grant her a judgment against Aetna as follows:

(1) a back pay award covering a period from the day Plaintiff was constructively discharged by Aetna, on or about March 31, 2023, until the date of Judgment, in an amount to be proven at trial, including but not

limited to lost pay, the lost value of fringe benefits, and other
compensation.

(2)  An order granting equitable relief against Aetna in the form of lost front
pay in lieu of reinstatement.

(3) Retaliation being an intentional tort, a judgment against Aetna  for
compensatory damages for pain and suffering, emotional distress, physical
injuries caused by emotional distress, and other damages Plaintiff suffered,
in an amount to be proven at trial.

(4) Aetna having specific intent to harm Plaintiff, a judgment for Plaintiff
against Aetna for punitive damages without cap, or alternatively, because
Aetna acted with an entire want of care evidencing conscious indifference
to the consequences of its actions, for punitive damages up to the $250,000
cap.

(5) A judgment against Defendants for intentional infliction of emotional
distress in an amount to be determined in the enlightened conscience of the
jury, but not less than $500,000, plus expenses of litigation including
reasonable attorneys' fees under OCGA 13-6-11, plus punitive damages
without cap in amount not less than $1,500,000, or alternatively at the cap
of $250,000.

(6) Under the FMLA, a judgment against Aetna for lost wages, salary, employment benefits and other compensation denied or lost to Primo because of Aetna's denial of her FMLA leave, plus interest, plus an equal amount as liquidated damages, plus reinstatement or front pay in lieu of reinstatement.

(9) For such other and further relief as the Court deems meet and proper.

PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.

Respectfully submitted this 2nd day of July, 2024.

**DALZIEL LAW FIRM**
*/s/ Charles M. Dalziel, Jr.*
Charles M. Dalziel, Jr.
Georgia Bar No. 203730
680 Village Trace NE Building 20E
Marietta GA 30060
(404) 735-0438
chuck@dallziellawfirm.com
Attorney for Plaintiff

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Atlanta District Office**
100 Alabama Street, SW, Suite 4R30
Atlanta, GA 30303
1-800-669-4000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
### (This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 04/04/2024

**To:** Dennice Primo
165 Brighton Court, S.W.
Marietta, GA 30064
Charge No: 410-2023-09244

EEOC Representative and email:    TREY PYLE
Sr. Federal Investigator
Trey.Pyle@eeoc.gov

## DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 410-2023-09244.

On behalf of the Commission,

Digitally Signed By:Darrell E. Graham
04/04/2024
Darrell E. Graham
District Director



EXHIBIT

A

**Cc:**
Kimberly Lawrence
1 CVS Drive
Woonsocket, RI 02895

LaDonna Hatton
Morgan, Brown & Joy
200 STATE ST STE 11A
Boston, MA 02109

Lisa Sheibly Esq.
Spielberger Law Group
4890 W. Kennedy Blvd., Suite 950
Tampa, FL 33609


Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method).  You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 410-2023-09244 to the

Enclosure with EEOC Notice of Closure and Rights (01/22)

District Director at Darrell E. Graham, 100 Alabama Street, SW Suite 4R30, Atlanta, GA 30303.

**To make a Section 83 request for your charge file,** submit a signed written request stating it is a "Section 83 Request" for Charge Number 410-2023-09244 to the District Director at Darrell E. Graham, 100 Alabama Street, SW Suite 4R30, Atlanta, GA 30303.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

## NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

### "Actual" disability or a "record of" a disability

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.

- In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions,** such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.

- **Only one** major life activity need be substantially limited.

- Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.

Enclosure with EEOC Notice of Closure and Rights (01/22)

☐ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.

☐ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

☐ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

☐ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.

☐ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability".

*Note: Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability. For more information, consult the amended regulations and appendix, as well as explanatory publications, available at* http://www.eeoc.gov/laws/types/disability_regulations.cfm.